UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
                              :
MATTHEW SOUTER,               : Civil Action No.
                              :
                  Plaintiff, :
                              :
         versus               : 1:20-cv-1295
                              :
C.T. IRBY, et al.,            : September 22, 2021
                              :
                  Defendants.:
------------------------------x

        The above-entitled Motions hearing was heard before
the Honorable T.S. Ellis, III, United States District Judge.

                    A P P E A R A N C E S

 FOR THE PLAINTIFF:      VICTOR M. GLASBERG, Esq.
                         NICKERA S. RODRIGUEZ, Esq.
                         Victor M. Glasberg & Associates
                         121 S. Columbus Street
                         Alexandria, VA 22314

 FOR THE DEFENDANTS:     PHILIP C. KRONE, Esq.
                         Cook Craig & Francuzenko PLLC
                         3050 Chain Bridge Road
                         Suite 200
                         Fairfax, VA 22030




OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                 United States District Court
                                 401 Courthouse Square
                                 Fifth Floor
                                 Alexandria, VA 22314

1              **P R O C E E D I N G S**

2    (Court proceedings commenced at 1:36 p.m.)

3              THE DEPUTY CLERK:  Good afternoon, Judge.

4              THE COURT:  Good afternoon, Tanya.  You may call the

5    next case.

6              THE DEPUTY CLERK:  The Court calls civil case

7    Matthew Souter versus C.T. Irby, et al.  Case No.

8    2020-cv-1295.  May I have appearances, please, first for the

9    plaintiff.

10             MR. GLASBERG:  Good morning, Judge.  This is Vick

11   Glasberg representing the plaintiff.  I'm with my associate,

12   Nicki Rodriguez, and I will be arguing this afternoon.

13             THE COURT:  All right.  Good afternoon,

14   Mr. Glasberg.  And who is on for the defendant or defendants?

15             MR. KRONE:  Good afternoon, Your Honor.  This is

16   Philip Krone on behalf of the defendants.

17             THE COURT:  All right.  Mr. Francuzenko is not

18   around?

19             MR. KRONE:  It will just be me today.

20             THE COURT:  All right.  I'm sure you can handle it.

21             All right.  This matter is before the Court on

22   cross-motions for summary judgment, although, the plaintiff is

23   seeking summary judgment on liability only.  And we're doing

24   this by telephone.  I'm not going to do these by telephone in

25   the future, but I'm still in a sort of pandemic mode.  So

1  we're going to proceed as follows:

2          We're going to begin, since there are cross-motions

3  with you, Mr. Glasberg, and I want to begin with a recitation

4  of a few facts and I want to focus on the first three claims

5  you make in your complaint, the 1983 claims.  That's what I

6  want to focus on at this time.  So I understand that

7  Mr. Souter was arrested and that he's complaining about the

8  arrest warrant, he's complaining about the mode of the arrest,

9  and he's complaining about the arrest in general under 1983.

10  I understand all of that.  And the facts, as I understand

11  them, Mr. Glasberg, are that Mr. Souter owns an old farmhouse

12  in The Plains, Virginia and he has a tenant, Ms. Johnson and

13  he wanted her to leave.  After serving her with a notice to

14  quit for various violations of their lease, he secured an ex

15  parte emergency protective order pursuant to 19.2-152.8 which

16  relates to committing acts of violence, force, or threat, or

17  criminal offenses resulting in injury to Ms. Johnson or her

18  property.

19          Now, then what happened is that she called the --

20  that was an ex parte order, and after getting the order, the

21  next day she called the sheriff's office because Mr. Souter

22  had cut off her electricity to her bedroom and the water to

23  her bathroom, in her view, violating the EPO.  And thereafter,

24  although there was an effort to call Mr. Souter, there was

25  never any contact with Mr. Souter and ultimately defendant

1  Gray obtained a -- not Gray -- Jacobs obtained an arrest

2  warrant.

3          Now he did so, even though he had, as I understand

4  it, possession of the emergency protective order and he had

5  read it.  He took it to a magistrate, who Mr. Glasberg goes

6  out of his way to remind me that they're not lawyers in our

7  antiquated Virginia process, he took it to a magistrate and

8  got an arrest warrant and said that the disruption of the

9  utilities was a criminal breach of the protective order, and

10  then an arrest warrant issued.  They went out, arrested

11  Mr. Souter.  I don't know what the other deputies knew.  I

12  just know that Jacobs, to whom the plaintiff made a complaint,

13  didn't talk to Souter either, tried to reach him but was

14  unsuccessful.  He had a copy of the emergency protective

15  order.  He took it to a magistrate to secure an arrest

16  warrant.  I don't know what the magistrate did, but they also

17  used the data source that the sheriff's office has at Fauquier

18  County that apparently did not have the full text of the EPO.

19          I don't know if there is any dispute at all as to

20  those facts, Mr. Glasberg.  Let me hear first from you.  Do

21  you have any dispute of the facts I recited?

22          MR. GLASBERG:  No dispute.  I would just clarify two

23  points, if I may.  The arrest warrant that was secured recited

24  the incorrect basis for the protective order.  And that is not

25  a technical irrelevant fact because the incorrectly cited

1  protective order provision, which is under 16.1 instead of

2  19.2, does provide, under certain circumstances, for

3  interference with utilities.  That was not the statute that

4  was invoked to get this protective order.  It was a

5  misstatement.  So the magistrate was given incorrect

6  information as to the legal basis for the contention that it

7  was a violation of the order in the first place.  That's the

8  first point.

9         The second point that I would want to point out is,

10 and you have the record references in the briefs, and I'll be

11 happy to review them with you, but all three of the arresting

12 officers profess complete knowledge of the protective order.

13 Deputy Jacobs, because as you have correctly said, he procured

14 it and he read it before he went to the -- to the magistrate.

15 Sergeant McCauley, on his own account, read it and was fully

16 familiar with it.  And on his account, Deputy Irby served such

17 orders.  The quotation, I think, is "dozens of times."  This

18 is a form order.  It's a template.

19        So it's not only Jacobs who can be and should be

20 charged with a complete knowledge of what is and is not

21 permissible under that order, but all three deputies.  Apart

22 from that, Judge, you have all the facts as is always the

23 case.

24        THE COURT:  All right.  Thank you, Mr. Glasberg.

25 Let's go to Mr. Krone.  Those facts are all undisputed, aren't

1  they?

2          MR. KRONE:  The facts that you set forth are.  I

3  don't believe the record set forth the defendant's knowledge

4  as clearly as Mr. Glasberg has stated their knowledge

5  regarding the protective order that was served on the

6  plaintiff as well as the arrest warrant that was executed.

7  And so all three defendants acknowledge it.  But the facts as

8  you stated, I believe, are not in dispute.

9          THE COURT:  What do you contend was Jacobs knowledge

10  of the protective order?

11          MR. KRONE:  Jacob's knowledge, I believe, as put, of

12  course, in the record, started with reviewing the -- and

13  I sometimes get acronyms wrong -- the VCIN program, which

14  indicated notes as to what the protective order was.  And in a

15  sequencing did that prior to obtaining the copy of the

16  protective order which he then brought forth to the

17  magistrate.

18          THE COURT:  All right.  Did Jacobs have the

19  emergency protective order which cited 19.2-152.8?

20          MR. KRONE:  When he went before the magistrate?  He

21  did.

22          THE COURT:  Whenever.

23          MR. KRONE:  When he went before the magistrate, he

24  did.

25          THE COURT:  So he read it then?

1          MR. KRONE:  That is, yes, his testimony.

2          THE COURT:  And so as far as Jacobs is concerned, he

3    knew that 19.2-152.8 applied only to threats of violence and

4    the sort, not utilities?  Is that correct, Mr. Krone?

5          MR. KRONE:  He would have known that -- that the

6    form that he had was for the 19.2 not the 16.  However, I do

7    say that he also went in with that knowledge of having

8    additional information from the VCIN system.

9          THE COURT:  All right.  I'll come to the VCIN

10   system, but I'll give you a forecast, Mr. Krone.

11         The VCIN system is not likely to save anybody in

12   this case.  You've got the actual EPO.  That's what matters.

13   If somebody enters from the sheriff's department or the police

14   department or wherever, inaccurate or insufficient

15   information, that's not going to save it.  But I'll let you

16   argue that later.

17         Let's go now to -- that was Jacobs.  Let's go to the

18   second person.  McCauley.  Let's see.

19         What did McCauley know, Mr. Krone?

20         MR. KRONE:  So McCauley had served the protective

21   order the night before and had explained to it and explained

22   to the plaintiff that he needed to understand it and that was

23   the night prior to --

24         THE COURT:  So --

25         MR. KRONE:  He testified that he did not look at the

1   order again after the warrant had been procured.

2           THE COURT:  Well, all right, but that could be his

3   problem, Mr. Krone.

4           In any event, he knew or should have known that the

5   EPO was based on 19.2-152.8 not 16 -- or it's the other way

6   around.

7           MR. KRONE:  No, you said it correctly.

8           THE COURT:  That it was issued under 19.2-152.8, not

9   under 16.2-253.  He knew that.  Now, let's go to the last

10  person.

11          How about Irby?

12          MR. KRONE:  Irby assisted when McCauley was there.

13  So he was present while McCauley spoke to the plaintiff but

14  that is it.

15          THE COURT:  All right.  So they get this arrest

16  warrant because they erroneously believe or represent to the

17  magistrate that it's based on 16.2-253 when it's, in fact,

18  based on 19.2-152.8.

19          Is that right, Mr. Glasberg?

20          MR. GLASBERG:  Yes, sir.

21          THE COURT:  All right.  Now, Mr. Krone, is that

22  right?

23          MR. KRONE:  The arrest warrant is based on the 16.2

24  statute.  The record before the Court does not -- it doesn't

25  state McCauley's review of the arrest warrant or knowledge

1    regarding the form and any information provided to the

2    magistrate.  Same as to -- as to the Deputy Irby who was asked

3    to come along for other reasons.

4            THE COURT:  All right.  You have a different view,

5    Mr. Glasberg?

6            MR. GLASBERG:  Yes, sir.  Both McCauley and Irby

7    testified under oath that they were knowledgeable of the terms

8    of the order and I have submitted that to the Court at

9    ECF 24-3 being a portion of McCauley's testimony.  And permit

10   me to quote very briefly.  This is McCauley on page 24,

11   starting at line 6.  "I remember reading the protective order

12   over with Mr. Souter explaining it to him and advising him

13   that any violation of the protective order could result in the

14   arrest for violation of the protective order."

15           "QUESTION:  Okay.  Now, as we saw, the protective

16   order has two pages.  One saying what the subject of the order

17   can or cannot do and on the second page there are definitions

18   and further explanations of that; is that so?"

19           "ANSWER:  Yes, sir.

20           "QUESTION:  And you reviewed all of that so you were

21   satisfied that he understood his obligations under the

22   protective order?

23           "ANSWER:  I even asked him if he understood it.

24           "QUESTION:  Okay.  And did he tell you that he did?

25           "ANSWER:  Yes, sir."

1 Okay, that's McCauley. And as for -- let me just bring it up

2 on the screen, Judge.

3     "ANSWER: As for Irby, he was there throughout and on

4 his own testimony...

5     Hang on.

6     (A pause in the proceedings.)

7     THE COURT: Mr. Glasberg, I thought you were old

8 enough to use a paper, rather than a screen.

9     MR. GLASBERG: Well, you know, I always use paper

10 and I never use a screen, and I find that I didn't make a

11 photocopy of the exhibits to my briefs, but I will represent

12 to you that he stood there and -- okay, well, here I can find.

13 This is document 24-4.

14     "QUESTION: Were you there when McCauley explained the

15 terms of the order to Matt?

16     "ANSWER: Yes."

17     And I will represent to you, Judge, and I know it's

18 in the record, and I will find it before this hearing is over

19 or later send it to you, in which he said that he had served

20 such orders, quote, dozens, end quote, of times.

21     And again, these are not -- these are not unique

22 orders drawn for the occasion. They're form orders and the

23 judge takes off whatever is appropriate in his views within

24 the confines that are available under that particular type of

25 order. And this type of order has nothing to do with

1  utilities and this is the type of order that Irby had served

2  dozens of times.  So that's actually the only -- I didn't

3  realize that was a fact in dispute, but I think the record is

4  clear that Irby was full well aware of the content and the

5  thrust of the protective order and --

6          THE COURT:  That's fine, Mr. Glasberg.  I

7  understand.  In the interest of the finite or fine institute

8  of life, let's go on.

9          MR. GLASBERG:  Yes, sir.

10         THE COURT:  Am I correct, Mr. Glasberg, that you

11  contend that the -- that the warrant was erroneously obtained

12  by misrepresenting to the magistrate that a different statute

13  was involved?  The warrant was issued under 19.2 instead of

14  16.2, and it should have been 16.2.

15         What is the mistake and who made the mistake,

16  Mr. Glasberg?

17         MR. GLASBERG:  In the first instance Deputy Jacobs

18  made the mistake.  He was acquainted with the order.  He

19  should have known that the order had nothing to do with

20  utilities, and that a complaint of a problem with the

21  utilities.  He should have handled it the same way that his

22  colleague did, who got the same call from Ms. Johnson earlier

23  in the day.

24         As you may recall from the brief and from the

25  deposition testimony, I believe his name was Young (ph).  She

1  called him and he wanted to speak to Souter.  He said there

2  could be, I think, I'm quoting, a thousand reasons why

3  electricity would have gone off.  This is, as you noted, an

4  old house the utilities are problematical at best.  So in the

5  first instance, Jacobs should have known that the protective

6  order that had been procured and served on Matt Souter simply

7  did not cover the alleged disruption with the utilities.

8          Secondly, in preparing the order, he should have --

9  I mean it might have precluded the magistrate from entering

10 the -- from providing the arrest warrant if he had provided

11 the correct statutory reference.  Because under the 16.2,

12 there may be a basis for proceeding, but there is none under

13 the 19.2.  So I would fault him on those two grounds, Judge.

14         THE COURT:  All right.  To distill what you've said,

15 Mr. Glasberg, it is the sheriffs, the deputies, who made the

16 mistake, not the magistrate?

17         MR. GLASBERG:  You know, in our system, we don't

18 know what is told to the magistrate but that certainly seems

19 to be the case.

20         THE COURT:  All right.  Now, Mr. Krone, clearly a

21 mistake was made, don't you agree?

22         MR. KRONE:  There's a wrong form that was used and

23 information that likely wasn't correct that was obtained, so,

24 yes.

25         THE COURT:  All right.  So as you say a wrong form

1  was used, a mistake was made.  Who made it, Mr. Krone?

2          MR. KRONE:  I believe that Deputy Jacobs had

3  information that was -- that would have been violative of a

4  certain protective order.  It's just the wrong information.

5  And he brought that before the magistrate and was -- was told

6  he was okay.

7          THE COURT:  All right.  So what you're saying is

8  Jacobs made a mistake and you concede that, don't you,

9  Mr. Krone?

10          MR. KRONE:  He made a decision based on incorrect

11  information.  He made a mistake of fact.

12          THE COURT:  He made a mistake?  Am I right,

13  Mr. Krone?

14          MR. KRONE:  You're right.

15          THE COURT:  All right.  Thank you.  Let's go on.

16  Now, let's cover this bit about the claim by your clients,

17  Mr. Krone, that they consulted a legal -- or not a legal, a

18  law enforcement database, VICN [sic], or whatever it's called.

19          And what's the relevance of that, in your view,

20  Mr. Krone?

21          MR. KRONE:  The relevance of that would be that as

22  Deputy Jacobs is responding to the complaint from Ms. Johnson.

23  He doesn't have the protective order in front of him and he --

24  and it's their first step is they pull it up and run it, run

25  the names through the system, and that's where he obtained the

1  information about the protective order which came across as

2  the subject may not interfere with the protected person, which

3  under the information he possessed from the -- the

4  complainant, Ms. Johnson, came across as a violation of the

5  order.

6          THE COURT:  All right.  Now, Mr. Krone, he did have

7  the actual EPO so he knew that that information from the VICN

8  [sic], or whatever it's called, was not entirely accurate in

9  this particular circumstance.

10          Is that right?

11          MR. KRONE:  Well, he obtained it after he prepared

12  to go in front of the magistrate so he brought it so he can

13  present it to the magistrate.

14          THE COURT:  All right, so, and I assume he read it

15  and knew it was based on 19.2-152.8, rather than 16.2-253,

16  right?

17          MR. KRONE:  I don't believe his testimony -- his

18  testimony clarified whether or not he made that connection.

19          THE COURT:  Well, how about this, and you agree he

20  should have made that connection?

21          MR. KRONE:  I agree that it is possible, but I can't

22  say that he made the connection.

23          THE COURT:  All right.  Well, I guess what I'm

24  getting at is I've looked at this with some effort to

25  understand what happened.  Clearly a mistake was made by these

1   deputies.  They went and got an arrest warrant on the basis of

2   a misunderstanding as to what the EPO covered.  And the

3   magistrate wasn't fully informed, presumably.  And I'm

4   unclear, Mr. Krone, why you think qualified immunity has

5   anything in the world to do with this.  They made a mistake,

6   they shouldn't have made the mistake, it has nothing to do

7   with unclear law.  It has nothing to do with the situation

8   where a law enforcement officer has to exercise judgment in a

9   particular situation that the law hasn't covered.  This is a

10  straightforward sort of thing where you read an EPO and

11  consider whether a violation has occurred and seek a warrant

12  based on the right statute.  He didn't do that.  So tell me

13  why you think qualified immunity has anything whatever to do

14  with this case.

15          MR. KRONE:  To start, there are three deputies

16  involved and there are distinct sets of facts that apply to

17  each of them.  As it relates to Deputy Jacobs, again, the

18  argument, and why it's related to qualified immunity, would be

19  that he had a mistake of fact.  He had read the VCIN, got the

20  information that it was not to interfere with a protected

21  person, which isn't completely irrelevant, it would make sense

22  and be reasonable under the 16.2 statute, and the mistake

23  occurs when he does that under mistake of fact.  Qualified

24  immunity is and still apply with mistake of fact and mistake

25  of law.  Here --

1          THE COURT:  But he --

2          MR. KRONE:  -- happened because of a mistake of

3    fact.

4          THE COURT:  Mr. Krone, Mr. Krone?

5          MR. KRONE:  Yes.

6          THE COURT:  How could he possibly make that mistake

7    if he had in his possession the EPO that cited 19.2 not 16.2?

8    You can't make that mistake.  You can't be excused for making

9    that mistake if you have the EPO that says 19.2 and -- I'm

10   sorry -- that says 16 -- I'm sorry, it says 19.2, and he knows

11   that the protective order, if it relates to utilities, would

12   say 16.2.  And the utilities is what this woman was

13   complaining about.

14         It's one thing to make a mistake of law or fact, but

15   this isn't a mistake, this is a blunder.  Isn't it?

16         MR. KRONE:  Well, the mistake, as you put it, the

17   "blunder," occurs after he's made the mistake, and he's

18   already -- he's taken in the information from the complainant,

19   Ms. Johnson, and then he -- which is, again, the

20   misinformation that the subject may not interfere with a

21   protected person.  He puts together the affidavit and then

22   grabs the emergency protective order and goes to the

23   magistrate.

24         Those circumstances are, again, limited to Deputy

25   Jacobs which the circumstances are different for McCauley and

1  Deputy Irby.

2          THE COURT:  All right.  So it's Jacobs, isn't it,

3  who inserts in the order submitted for the magistrate to

4  approve that it's an order under 19.2-152.8, right?  He's the

5  one that does that?  And you're telling me he does that

6  because he looks at the VICN [sic] database and it just says

7  "interfering with a person."

8          MR. KRONE:  Yes.

9          THE COURT:  All right.  Well, it probably is not

10  charitable of me to characterize that as a blunder, but he had

11  the EPO or he ultimately had the EPO and he ultimately read it

12  and he knew that the complaint of this person related to 16.2,

13  but this EPO was only 152 -- 19.2-152.8.  So that's the

14  mistake that I'm focussing on, Mr. Krone.

15          And let me ask you one further question on qualified

16  immunity.  Did you, in your brief, cite any circuit opinion

17  that you think is closely on point, factually, to this case,

18  that says qualified immunity protects these officers from this

19  mistake?

20          MR. KRONE:  I did not cite a circuit.  I did cite

21  district court.  The *Guerrero v. Deane* case, which I think is

22  extremely applicable, especially Deputy Irby and Corporal

23  McCauley, as it relates to whether or not they were under a

24  responsibility to conduct their own investigation as to

25  what -- as to what information and the process that Deputy

1   Jacobs undertook to get the arrest warrant.

2          THE COURT:  Tell me briefly what the facts of that

3   case were.

4          MR. KRONE:  In *Guerrero v. Deane*, there was an

5   officer responding to a house and he had called for backup and

6   the officers here that are related that are most in connection

7   with Deputy Irby and Corporal McCauley, arrived to the house

8   where they come across -- the officer asked for -- called for

9   backup, has his foot and leg in the doorway of the house, and

10  they come up to a scene where it appears the person is closing

11  the door on the officer.

12         So when they come up to the scene, they see this

13  happening and it's -- they're relying on what they're

14  perceiving, not necessarily what the Court determined is --

15  whether or not the original officer unlawfully entered.  You

16  know so in this case the responding officers aren't the ones

17  who were involved in any potential unlawful entry, so when

18  they get to the scene what they do is -- isn't

19  unconstitutional.  They have something else going on here.  We

20  have Deputy Irby and Corporal McCauley.  Corporal McCauley,

21  Jacobs tells them he has the arrest warrant.  He says, "Okay.

22  We're going to have multiple people go out because there's an

23  alert on the premises for the plaintiff."  He asked Deputy

24  Irby to come.

25         And what I was mentioning before was opposing

1    counsel was talking about how they had been aware of the terms

2    of the order, there's no evidence before the Court right now

3    about them reading the arrest warrant or looking over the

4    arrest warrant that Deputy Jacobs obtained.  They received

5    that information from Deputy Jacobs that they had an arrest

6    warrant.  So when they get -- when they show up, they don't

7    have the same information as to the protective order.  While

8    Corporal McCauley had read it the day before, that was a day

9    before.  He had testified that he did not believe he had seen

10   a copy of it when they went to execute the arrest warrant.

11   While Deputy Irby was present when Corporal McCauley explained

12   it.  Again, neither of them recall reading it again prior to

13   executing the arrest warrant.  So their actions are based on

14   what they are being provided by Deputy Jacobs.

15              THE COURT:  I thought --

16              MR. KRONE:  Even if the Court determines there's a

17   violation there, it's not the fruit of the poisonous tree.  It

18   doesn't get to be used in a civil instance to -- as a sword to

19   impose liability on other officers who didn't take it on their

20   own to complete another investigation of what information that

21   they've been provided by another officer.

22              THE COURT:  Mr. Glasberg, you agree with that

23   characterization of what the other officers knew, Jacobs and

24   McCauley?

25              MR. GLASBERG:  No, sir.

1          THE COURT:  Or not Jacobs.

2          MR. GLASBERG:  Permit me, however, just to clarify

3   with regards to Jacobs.  Here is his testimony.  It's at 26 --

4   ECF 24-6.  Just to make it absolutely clear.

5          "QUESTION:  Did you read the protective order before

6   giving it to the magistrate?

7          "ANSWER:  Yes.

8          "QUESTION:  So you gave the magistrate Exhibit 10

9   which is a protective order on Exhibit 11, which is your

10  criminal complaint, is that correct?

11         "ANSWER:  Yes.

12             So there isn't any question that Jacobs absolutely

13  positively knew what was in the protective order.

14             Now, we get to the interesting fact.  The protective

15  order was served the day before by, guess who?  McCauley and

16  Irby.  They were the ones who served the protective order.

17  McCauley read it to Souter.  Irby heard it.  It was all there

18  and they went -- they went the next day to arrest him for

19  having violated the protective order.  That's indubitable.

20  It's obviously what happened.  The notion that they were

21  there, you know, because he was getting arrested for bank

22  robbery or for murder or for something else is a complete

23  fantasy.  They were there because he had allegedly violated

24  the protective order.  Jacobs got the warrant and it was a

25  warrant to arrest Souter for having allegedly violated the

1  protective order which fewer than 24 hours before McCauley and

2  Irby had procured and served on Jacobs.

3       So I would respectfully submit that there is a

4  abundant evidence on the basis on which this Court can

5  properly charge all three arresting officers with knowledge

6  that the arrest was not a permissible arrest given the scope

7  of the protective order and the alleged offenses.

8       THE COURT:  Well, Mr. Glasberg your client did shut

9  off the utilities and --

10      MR. GLASBERG:  No, sir.  Well, because there's no

11 evidence that he did and he has -- he didn't do that, Judge.

12 He didn't shut off the utilities.  That is certainly what she

13 claimed and I don't dispute the fact that she made the claim.

14 He did no such thing.  What happened -- we're not here to

15 debate facts, but I just put it in the memo in a footnote.

16 After being served with the order, he said he was going to do

17 absolutely nothing.  I'm not going to go near Melissa Johnson.

18 He left early the next morning and came back about an hour

19 before he was arrested.  He was helping a friend buy a car.

20 He shut off no water, he shut off no electricity.  The

21 electricity goes off all the time because the electrical

22 system they have there and the bathroom wasn't functioning,

23 and everyone was using the other bathroom.

24      So this is a factual matter and I don't believe that

25 it bears on the adjudication of this motion, but no he did

1    not -- he took no steps to adversely affect anyones utilities

2    in the house.  And there were other -- there was another

3    tenant in the house, by the way.

4             THE COURT:  Mr. Glasberg, let me ask you this

5    question.  It might help clarify things.

6             What do you think should have happened in this case?

7    Let's assume that Miss, whatever her name is, I've forgotten

8    her name is, Johnson, let's assume she lost water and

9    utilities in her bathroom and let's assume she mistakenly

10   thought that was a violation of the emergency protective order

11   and she called the deputies.

12            What should have happened, Mr. Glasberg?

13            MR. GLASBERG:  I don't think it has to be a

14   hypothetical answer.  We know what should have happened.  It's

15   what happened when she spoke with Deputy White.  She spoke to

16   Deputy White and that's laid out in my memo in support of the

17   summary judgment motion with Deputy White's testimony.  He

18   received her information.  He then tried to reach Souter, who

19   was out.  He was helping a friend buy a car because he didn't

20   want to stick around where Johnson was.  When I asked him why

21   did he want to speak to Souter, I mean it's an obvious

22   question, he gave an obvious answer.

23            "QUESTION:  It could be a thousand different reasons

24   why the power was out, but I like to do the full portion of

25   the investigation to try to figure out why the power was out

1  to talk to the landlord about that."

2       That ends the quote.  It's at a footnote on page 4

3  of my memo.  And he tried to put in some calls and he couldn't

4  reach Souter because Souter wasn't there.  The only reason

5  this ended up in Jacobs lap was that there was a change in

6  shift.  So that when Melissa Johnson called again, White

7  wasn't there and he didn't follow up.  So what should have

8  happened is exactly what White said.  He said that he also

9  testified, and I think I have it in the record as well.  Yes,

10 that's right.  He said "I was trying to get a civil agreement

11 to have the power restored."  That is not knowing if it had

12 been done deliberatively or by accident in this old house.  He

13 wanted to resolve it in the way in which it could be done

14 without invoking criminal -- the provisions of the criminal

15 code.

16      Unfortunately, he went off duty and then the call

17 came and Officer Jacobs did not see fit to proceed that way.

18 He said he thought that he may have called Souter to find out

19 what happened.  But then on consulting his records, he saw

20 that there was no reference of such a call and he acknowledged

21 that if he had made a call he would ordinarily have put it in

22 his record, so he testified.  This is at Exhibit 6 at page 79.

23 He testified that making a call "Something I would document in

24 my incident report, but it's not in my report that I attempted

25 to do so."  So he didn't do that.  He didn't do what White

1  did.  So that's why I stated that what should have been done

2  is in fact what was done by White, but then it fell into the

3  hands of other deputies.

4         THE COURT:  Mr. Glasberg, where or how did the

5  magistrate judge or the magistrate -- why did the magistrate

6  issue an arrest warrant under 16.2- -- no, under 19.2-152.8.

7  In other words, where did the magistrate get that citation

8  from?  Is that a form that Jacobs gave to him?

9         MR. GLASBERG:  Yes.  Well, I cannot tell you that.

10  I don't know if he gave him -- let me think, I'm trying to

11  remember.  Whatever it is --

12        THE COURT:  Well, does the warrant list the 19.2?

13        MR. GLASBERG:  No, sir, no, sir.  The warrant list

14  the incorrect statute.  So either that was provided directly

15  by Jacobs or Jacobs told it to the magistrate who filled it

16  out, I believe.  And I'll have to check the deposition, Judge,

17  I'm sorry.  I know a lot of the facts but not every single

18  one.  I believe that warrants of this sort are filled out, at

19  least in terms of the pro forma information, are filled out by

20  the reporting officer and given to the judge or the magistrate

21  to sign off and indicate what provisions will be enforced.  I

22  believe that it was Jacobs who put in the 16.1, but if he

23  didn't, then he would have told that to the magistrate,

24  because there are different warrants.  And a warrant under

25  16.1 might conceivably be invalid for this type of offense.

1          THE COURT:  Well, it's 16.2 not 1, isn't it?

2          MR. GLASBERG:  Yes, sir, sorry.

3          THE COURT:  So let me ask once again, Mr. Glasberg.

4   Does the warrant lists a statute?  And if so, which ones; 16.2

5   or 19.2?

6          MR. GLASBERG:  16.2, Judge.  That's on the warrant.

7   And if you give me a moment, I'll give you the exhibit.

8          (A pause in the proceedings.)

9          MR. GLASBERG:  Okay.  It's Exhibit 5 to the

10  defendant's motion for summary judgment.  It's ECF 22-5.

11  And --

12         THE COURT:  All right.  Now, let me go on now.  So

13  the warrant issued under 19.2 or 16.2, does it specifically

14  say one or the other?

15         MR. GLASBERG:  It's 16, Judge.

16         THE COURT:  All right.  Now, the protective order

17  doesn't recite 16.2, it recites 19.2.  Is that correct?

18         MR. GLASBERG:  That's correct, Judge.

19         THE COURT:  Now, you can't get an arrest warrant,

20  can you, just without -- the whole point here was a violation

21  of an EPO.  You can't go to a magistrate and get an arrest

22  warrant based on 16.2 just on your say so, is that right?

23         In other words, the predicate has to be the

24  violation of the EPO.

25         MR. GLASBERG:  No doubt about it, Judge.  That's

1  what the -- the offense, the offense in Section 16 is

2  violating the EPO.  But that EPO -- that -- let me make it

3  clear, if I may, Judge.  That only refers to the 16.  You

4  can't get an arrest warrant under 16.1-253.2 for a violation

5  of 19.2.

6         THE COURT:  All right.  What I'm going to do is

7  this, I'm going to take a brief recess and I'll give you each

8  about five to ten minutes to give me whatever else you want to

9  tell me about the motions for summary judgment that are at

10 issue and you need not repeat what we've gone through, but you

11 certainly may address anything.  And we'll start with you,

12 Mr. Glasberg.  And I am only interested in the 1983 claims at

13 this time.

14         So let me take a brief recess and I'll come back.

15 Tanya, can you remove me?

16         THE DEPUTY CLERK:  Will do, Judge.

17         (A short break was taken.)

18         THE DEPUTY CLERK:  Okay, everyone, Judge Ellis is on

19 his way back into the hearing.

20         Judge, you're back into the hearing.

21         THE COURT:  Thank you, Tanya.  I am back.  And I

22 have an additional question and then I want to give you each

23 an opportunity to tell me anything you wish to tell me

24 focussing on counts or claims 1 through 3, the 1983 claims.

25 But the first thing I want to be clear and confirm, I've now

1  looked at the arrest warrant and confirm that the arrest

2  warrant cites 16.1.  And my question to you, first,

3  Mr. Glasberg is, who filled in that 16.1, the magistrate or

4  the officer seeking the warrant, or do you know?

5          MR. GLASBERG:  I believe it was Jacobs and I

6  will have to confirm that, but that's what I believe to be the

7  case.

8          THE COURT:  All right.  Do you know, Mr. Krone?

9          MR. KRONE:  I cannot say for certain whether it was

10 the magistrate or Jacobs, Your Honor.

11         MR. GLASBERG:  Well, we are going to try to look it

12 up in the transcript, Judge.

13         THE COURT:  That will be useful for me to have in

14 mind.  What I'm going to do is take the matter under

15 advisement.  I will say this much and then I'm going to give

16 you each about ten minutes to tell me anything else you want

17 to tell me because I don't want to preclude either of you from

18 having a full opportunity to be heard.  But it seems to me

19 that this was a series of mistakes made chiefly by the

20 defendants, and in that regard, chiefly by Jacobs.

21         I don't have any doubt that all three of the

22 defendants knew what the EPO said and the EPO would have been

23 an EPO issued pursuant to 19.2, not 16.1 or 2.  So they would

24 have known that the shutting off of the utilities was not an

25 act of violence, force, or threat, or criminal offense.  And

1  so getting an arrest warrant on that basis was just a mistake,

2  and it's a mistake no officer should make.  I don't see any

3  basis for qualified immunity, but I'm going to think about it

4  some more, Mr. Krone.  The case you cite, the foot in the door

5  case by Judge Cacheris, that's, of course, a case that relies

6  further on what those officers or backup officers observed at

7  the scene.  None of that is true here.

8        But having said that, I now want to give you an

9  opportunity, one at a time, we'll begin with you, Mr. Krone,

10  to tell me anything else that isn't in your brief that you

11  think I should know as I consider and reflect on this.

12        You go first, Mr. Krone.

13        MR. KRONE:  Thank you, Your Honor.  I did want to

14  clarify one thing that was mentioned.  It stated that McCauley

15  and Irby procured their emergency protective order.  We're

16  talking about shift changes again.  There is a shift change

17  when they got put on.  They were provided a protective order

18  to be served, McCauley was, and asked for Irby to come along.

19        In the *Guerrero* case that I discussed, they cite to

20  another district court case, the *Ware v. James City County* for

21  the proposition, again, that they weren't -- the other

22  officers weren't required to conduct an independent

23  investigation.  The *Ware* case, which wasn't fully briefed at

24  all in the brief, that involves officers who were actually on

25  the scene hours before the ultimate incident where another

1　officer responded and then called for backup.

2　　　　And again, here McCauley and Irby aren't the

3　arresting officers.　There's a day in-between them serving

4　this protective order and then receiving information that

5　there's, you know, that there's been a complaint that has been

6　violated and that an arrest warrant has been served.

7　　　　As it relates to qualified immunity, I don't believe

8　it's clear that Irby or McCauley was under an obligation to

9　double check the arrest warrant or to double check the

10　emergency protective order.　And they took action based on the

11　information they were provided.　Under the -- it's a fact Irby

12　arrived at the scene and was not -- was not amongst the

13　conversation as it was to the arrest warrant until he saw the

14　conversation become physical, in which case he then proceeded

15　to come up to McCauley, the plaintiff, and Jacobs.

16　　　　THE COURT:　What do you mean it became physical?

17　　　　MR. KRONE:　When they went to arrest him -- when

18　they arrested him.

19　　　　THE COURT:　What do you mean it became physical?

20　　　　MR. KRONE:　When they grabbed his arm to put him in

21　handcuffs and he pulled away.

22　　　　THE COURT:　And then what happened?

23　　　　MR. KRONE:　Irby saw him -- observed the plaintiff

24　being noncompliant and then he was at the gate and came

25　forward to where the other officers and the plaintiff were.

1          THE COURT:  All right.  Answer this question,

2    Mr. Krone, you represent all three defendants, Jacob, Irby,

3    and McCauley, right?

4          MR. KRONE:  Yes.

5          THE COURT:  Now, they are sued in their official or

6    individual capacities?

7          MR. KRONE:  They are sued in their individual

8    capacities?

9          THE COURT:  Is that right, Mr. Glasberg?

10         MR. GLASBERG:  Yes.  This is individual capacity

11   only.

12         THE COURT:  All right.  Now, if there were a

13   judgment, Mr. Krone, issued against those two individuals, who

14   pays the judgment?  The sheriffs, the Department, or the

15   individuals?

16         MR. KRONE:  Well, they are covered by the program

17   through the Virginia Treasury.

18         THE COURT:  All right.  That's helpful.  Thank you.

19         Do you have anything else you want me to know,

20   Mr. Krone?

21         MR. KRONE:  No, I believe the *Guerrero* case and the

22   *Ware* case are on point for qualified immunity.  You know in

23   regards to whether there's a clearly established law, you

24   know, that they had to investigate the information before

25   them.  And outside of the brief and what's already been

1    discussed, I just think I would be repeating myself as it

2    relates to Deputy Jacobs.  That is all.

3            THE COURT:  All right.  All right.  It's your turn,

4    Mr. Glasberg.

5            MR. GLASBERG:  Thank you, Judge.  I don't believe

6    *Guerrero* bears on this case at all.  There's no question here

7    about charging these deputies with the need to make an

8    independent investigation or to second guess anybody.  They

9    affirmatively had knowledge of the problem at issue.  They

10   didn't have to investigate.  They are charged with that

11   knowledge.  They served -- the two of them served the

12   protective order and the next day went to Jacobs and recited

13   the protective order.  That's all, I believe, in the record.

14           I do want to address one point that you asked,

15   Judge, which I didn't have the deposition page in front of me,

16   but I do now.  And I will tell you that both McCauley and Irby

17   testified that they were aware that the warrant was for

18   violation of the protective order.  It's in Deputy Irby's

19   testimony at page -- page 26, lines 15 through 19.

20           "The arrest was for violation of a protective order

21   that had been fairly recently obtained, is that correct?"

22   "Yes."  That's Irby.

23           And the same is available from -- forgive me -- from

24   McCauley.  If I can only find it, which I can't.  But I

25   represent to you, Judge, that McCauley was a superior officer

1  in this matter.  When Jacobs determined to serve the arrest

2  warrant that he had obtained, he went to his supervisor and

3  advised him that he was going to serve this arrest warrant for

4  violation of the protective order and McCauley said that he

5  would go with him and that he should get Irby to go as well,

6  and I can provide and will provide the record reference to

7  that.

8          I think that that's pretty much it, Judge.  I

9  believe that each of these three officers are properly charged

10 with knowledge of the protective order.  They are properly

11 charged with knowledge of what the alleged violation was of

12 the protective order.  They are all properly charged with

13 knowledge that the alleged violation violated no protective

14 order that had been imposed on Mr. Souter.  They are all

15 chargeable with knowledge that the arrest warrant they got was

16 predicated on the wrong statute, that it involved a claim of

17 criminal conduct that was not tenable under the statute or

18 under the protective order that had been served the day

19 before.

20         So I believe that they're all equally culpable.

21 Deputy Jacobs for having procured the arrest warrant and the

22 other two for having knowingly -- fully knowingly participated

23 in the arrest and the incidents of the arrest which did,

24 unfortunately, involve some physical behavior that's not

25 before the Court right now.  But these circumstances rendered

1  the arrest of unreasonable, I respectably submit, as a matter

2  of law for which reason the plaintiffs motion for summary

3  judgment on liability should be granted.

4        THE COURT:  Mr. Glasberg, let me ask once again so

5  that I'm clear.  I think you've answered it before but I want

6  to be clear.

7        The arrest warrant cites 16.2-253 or 16.1?  Who gave

8  the magistrate that citation or did the magistrate himself --

9  I'm sorry, or did the magistrate himself put in that statute?

10        MR. GLASBERG:  I think I can tell you definitively

11  that it was information that was provided by Jacobs.  Either

12  he told it to the magistrate or if we look on the affidavit --

13  a moment please for me to find it.

14        THE COURT:  He should have -- Jacobs should have

15  submitted an affidavit in support of the arrest warrant,

16  right?

17        MR. GLASBERG:  Well, unfortunately --

18        THE COURT:  Not the way it happens in the state

19  system, I know.  It often doesn't happen that way.

20        MR. GLASBERG:  Well, I think that you need an

21  affidavit for a search warrant, Judge.  I don't think you need

22  one for an arrest warrant.

23        THE COURT:  No, you're right, that's correct.

24        MR. GLASBERG:  Hang on.  I'm going to have an answer

25  for you in a second, Judge.

1          THE COURT:  All right.  Let me be clear.  My

2    question was:  How did the information of 16.1 or 16.2 get to

3    the form or get to the arrest warrant?  Did it come from

4    Jacobs or did it come from the magistrate?

5          Now, what you've told me so far is that either came

6    from Jacobs orally or he, in fact, filled it in in the arrest

7    warrant.

8          MR. GLASBERG:  I'm looking at the criminal

9    complaint, Judge, and I do not see an identification of any

10   particular statute.  Simply that there was a protective order

11   served.  I spoke with Melissa Johnson.  She told me that --

12   after Matthew was served with a protective order -- here we

13   go.

14         All right.  So without my -- without my associate,

15   Judge, I get nothing right.  I'm looking at it now.  It's

16   Exhibit 11 to the deposition of Jacobs.  And in the lower

17   right-hand corner what appears in 16.1-253.1, violation of

18   protective order.  So that's on the criminal complaint that

19   was submitted by Jacobs to the magistrate and I expect that

20   that is what the magistrate relied on in reciting the same

21   statute on his -- on the warrant.  Although, the warrant might

22   have been prepared in full by Jacobs.  He didn't recall

23   whether he wrote the warrant, the arrest warrant or the

24   magistrate did.  But we do have him saying in his criminal

25   complaint, we do have a reference in the criminal complaint to

1   16.1.

2           THE COURT:  All right.  Thank you.  Mr. Krone, do

3   you have anything you want to add to that information?

4           MR. KRONE:  Real quick, Judge.  Victor you said in

5   the criminal complaint it reference 16.1?

6           MR. GLASBERG:  Yeah, if you look at Exhibit 11 to

7   the Jacobs deposition, you'll see it at the lower right.

8           THE COURT:  I'll give you a moment.

9           MR. KRONE:  In his deposition, when asked by counsel

10  about his criminal complaint, he says, and it's on page 50 of

11  his deposition that he drafted it.  And then the question was:

12          "QUESTION:  And then, "he" being the magistrate,

13  issued the arrest warrant?"

14          I don't think -- I don't think there's a clear

15  indication whether or not the arrest warrant was actually

16  typed out by Deputy Jacobs, especially since all the other

17  forms by Deputy Jacobs were handwritten and the arrest warrant

18  is typed.

19          THE COURT:  Well, it wouldn't matter, would it

20  Mr. Krone, if the magistrate relied on the information, mainly

21  16.1, that Jacobs gave him?

22          In other words, it doesn't matter whether Jacobs did

23  the arrest warrant or not, if the magistrate used the

24  information to fill out -- if the magistrate did it, he used

25  the information that Deputy Jacobs gave him.

1          MR. KRONE:  Correct.  And that's the information

2    that was provided.

3          THE COURT:  All right.  As I indicated, I'm going to

4    take the matter under advisement.  Let me suggest to the

5    parties that this seems to be a case that ought to be settled.

6    I mean no fair-minded person can conclude that Mr. Souter

7    should have been arrested in these circumstances.  The EPO had

8    nothing to do with utilities, and yet he was arrested.  And I

9    haven't heard the litany of indignities he suffered as a

10   result of being arrested, but I leave that for another time.

11         It ought to be settled.  You all don't need to spend

12   time on this.  He shouldn't have been arrested.  The only EPO

13   at issue had to do with threats, acts of violence, force, or

14   threats, or criminal offenses.  None of which were violated by

15   the defendants or by Souter, by the plaintiff, when the

16   utilities were terminated at her bathroom.

17         Even assuming that Souter did it, which, of course,

18   is a fact issue I don't have to resolve at this stage.  But

19   she clearly doesn't like him and he doesn't like her.  This is

20   a landlord/tenant dispute that has erupted beyond that.

21         By the way, Mr. Glasberg, does she still live there?

22         MR. GLASBERG:  No, sir.

23         THE COURT:  All right.  Well, at least there won't

24   be another explosion then.

25         All right.  But it should have been resolved as a

1  landlord/tenant dispute and not as invoking the strong arm of

2  the law to go out there and arrest people.

3       So I recommend to you, Mr. Glasberg and Mr. Krone,

4  that you get together with your clients and see if this matter

5  can be resolved.  In any event, I'm taking it under advisement

6  and I will let you know in due course my decision on the

7  pending cross motions for summary judgment and partial summary

8  judgment.

9       Obviously, for the plaintiff, I couldn't get to

10  damages and I can't get to -- excessive use of force is a

11  separate claim under the Fourth Amendment and usually there

12  are factual issues there.  But you all --

13       MR. GLASBERG:  Judge, may I address that just for

14  one second?

15       THE COURT:  Yeah, do you have a video of it?

16       MR. GLASBERG:  No, I don't think I need one, because

17  if the arrest is impermissible, then no amount of force is

18  appropriate.

19       THE COURT:  Yes, I saw that in your brief and I'll

20  look at that.  I saw that, Mr. Glasberg.

21       MR. GLASBERG:  Thank you.  That's the only reason

22  that I raise that.  I understand that the extent of injury,

23  obviously, is another matter, but it's predicated on a notion

24  that if the arrest is impermissible then no amount of force is

25  permissible.

1          THE COURT:  All right.  But the amount of force used

2     is actually going to be necessary to establish for damages.

3          MR. GLASBERG:  Yes, sir.

4          THE COURT:  All right.  I thank counsel for your

5     cooperation.  I remind you that the best resolution to these

6     things is a settlement.  You know the primary duty for every

7     lawyer is to solve his client's problem.  If this matter isn't

8     settled, it's going to continue and litigation usually ends up

9     profiting no one but lawyers, not the parties.  No matter what

10    happens, even if the defendants were ultimately to prevail,

11    they're going to have to spend a lot of money to litigate this

12    if it's not settled.

13         And, of course, if Mr. Glasberg prevails, he would

14    point out to you that he keeps careful track of his time and

15    he gets legal fees under 1983.

16         Am I correct, Mr. Glasberg?

17         MR. GLASBERG:  Yes, sir, on both counts.

18         THE COURT:  All right.  Well, you-all do well, stay

19    well during this pandemic.  I hope you are doing well.  And I

20    will let you hear from me in due course.  Thank you-all very

21    much.

22         MR. GLASBERG:  Thank you, Judge.

23         MR. KRONE:  Thank you, Your Honor.

24

25         **(Proceedings adjourned at 2:55 p.m.)**

CERTIFICATE OF REPORTER

1

2

3      I, Tonia Harris, an Official Court Reporter for

4  the Eastern District of Virginia, do hereby certify that I

5  reported by machine shorthand, in my official capacity, the

6  proceedings had and testimony adduced upon the Motions

7  hearing in the case of the **MATTHEW SOUTER versus C.T. IRBY,**

8  **et al.**, Civil Action No. 1:20-cv-1295, in said court on the

9  9th day of May, 2021.

10      I further certify that the foregoing 39 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15      In witness whereof, I have hereto subscribed my

16  name, this February 6, 2022.

17

18

19

20

21  _____
         Tonia M. Harris, RPR
22       Official Court Reporter

23

24

25