UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| MATTHEW SOUTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. #1:20-cv-1295 (TSE/JFA) |
| | ) | |
| C. T. IRBY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

DECLARATION OF VICTOR M. GLASBERG

---

Victor M. Glasberg, #16184
Nickera S. Rodriguez, #95952
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
nsr@robinhoodesq.com

Counsel for Plaintiff

++++++++
EXHIBIT 1
++++++++

Professional Background and Experience .......... 1

Overview of Lawsuit .......... 3

Review of *Johnson* factors .......... 5

The Results Obtained .......... 5

Time and Labor Required .......... 6

Skill Required .......... 9

Hourly Rates .......... 10

Novelty and Difficulty of Issues .......... 11

Preclusion of Other Work .......... 12

Customary Fee for Like Work .......... 12

Nature of the Fee .......... 13

Time Limitations .......... 13

Experience, Reputation and Ability of Counsel .......... 13

Undesirability of the Case .......... 14

Relationship With Client .......... 14

Awards in Similar Cases .......... 14

Costs .......... 15

Requested Award .......... 15

In support of my firm's application for an award of attorney's fees and costs, I, Victor M. Glasberg, declare under penalty of perjury that the following is true:

Professional Background and Experience

1. I received my J.D. degree from the University of Pennsylvania Law School in 1976. I also hold a Ph.D. in history from Harvard University, which I received in 1972. My area of specialization was twentieth century race relations in the United States. Upon completing law school, I was designated a Reginald Heber Smith Legal Services Fellow, but declined the fellowship in order to accept employment in Phillip Hirschop's Alexandria, Virginia firm doing civil rights work. In March 1982, I resigned from the firm to open my own law practice.

2. From the beginning of my practice in 1976, I have specialized in federal civil rights litigation. I regularly review civil rights decisions and obtain continuing education in civil rights law. Since May 1979, I have served as a volunteer member of the legal panel of the American Civil Liberties Union of Virginia. In this capacity I have participated in reviewing requests for ACLU assistance and in recommending whether the ACLU will take a proposed case. I am a former chairman of the legal panel. I have also litigated numerous ACLU cases in Alexandria's federal court. In 1980-1982, I served as initial vice-president of the board of directors of the newly created Legal Services of Northern Virginia, Inc., the publicly funded provider of legal services to the local low-income community. I served as president of LSNV from 1982 to 1986. In October 1986, I testified before the House Subcommittee on Civil and Constitutional Rights, United States Congress, on civil rights implications of proposed federal legislation, subsequently enacted, regulating the medical profession. In March 1991, I testified before the same committee

in support of H.R. 1, ultimately enacted into law as the Civil Rights Act of 1991. In 1985, I served as special counsel to the Alexandria Human Rights Commission relative to a discrimination complaint in relation to which the Alexandria city attorney could not advise the commission. I served the Prince William County Human Rights Commission in the same capacity in 2006. I have testified in court as an expert in the field of civil rights litigation, and have taught continuing legal education in this field, including, in recent years, local and nationally broadcast seminars on police misconduct. In May 2019, I participated in a panel on demonstrations and the First Amendment before the 2019 Joint Judicial and Senior Court Managers Conference of the District of Columbia Superior Court. In recognition of my civil rights work, in 1994 I received the Guardian of Liberty Award from the American Civil Liberties Union of Virginia. In 2017, I received the Oliver White Hill Courageous Advocate Award from the Virginia Trial Lawyers Association. In January 2020, Judge Alston recognized my "decades of experience in successfully litigating civil rights cases of great import in this Court and others, as well as [my] reputation as a preeminent civil rights attorney. . . ." *Rogers v. Va. State Registrar,* #1:19-cv-1149 (E.D.Va. January 23, 2020), ECF 73 at 9. In February 2022, together with Judges Roger Gregory and John Gibney and others I was elected to the Virginia Lawyers Hall of Fame, in recognition of my civil rights work.

3. Attached hereto as Exhibit 2 is a list of a number of my civil rights cases, most of them litigated in this court.

Overview of Lawsuit

4. I was first contacted about Matthew Souter's case in July 2020 by lawyers at the Tate Bywater law firm who had been looking into it. They sought my review and assessment of the case. In September 2010, I first met Mr. Souter via Zoom, in a conference with Tate Bywater counsel. Based on that conference and receipt of additional information from counsel, I thereafter presented my assessment and concerns to Mr. Souter and counsel at Tate Bywater, which firm then decided, with Mr. Souter's agreement, to hand over the entire representation of Mr. Souter to me.[1]

5. I determined that the strength of the case lay in a purely legal matter: the procurement of an arrest warrant without probable cause. I flagged significant difficulties in the case as initially presented to me. These were in part relative to aspects of Mr. Souter's claim for damages, and in part arising from his passionate and florid manner of describing what had happened to him – understandable, perhaps, but risking to put off a jury in my view. In due course I proposed a litigation strategy focusing on the legal issue of the unconstitutionality of the arrest warrant, with an excessive force claim to be litigated solely on the theory that no force could constitutionally have been used to effectuate an unconstitutional arrest. Mr. Souter agreed to proceed in this manner.

6. I filed the complaint in November, 2020, following which the case was litigated in an efficient and economical manner. There were no discovery disputes requiring resolution, and the first time counsel appeared on motions was for the parties' cross-motions for summary judgment

[1]Counsel at Tate Bywater have confirmed to me that they assert no claim for compensation arising out of this lawsuit.

on September 22, 2021 (ECF 33). By memorandum opinion and order entered March 23, 2022 (ECF 39, 40), the Court granted summary judgment to Mr. Souter on liability on his Fourth Amendment claims. The case then went to trial on August 16-18, 2022 on those claims alone, Mr. Souter having previously voluntarily dismissed his pendant state claims as superfluous, in light of the Court's rulings on liability on the federal claims. ECF 49, 69. On August 18, 2022, the jury returned a verdict against the three defendants, in unequal measures, in the total amount of $50,000. ECF 99.

7. On September 16, 2022, Mr. Souter, acting *pro se* and without notice to or prior vetting by his counsel of record, filed a motion for a new trial. He alleged, among other things, that counsel for both sides had engaged in unethical and prejudicial conduct and malpractice, purposefully avoided "knowledge of offense," intimidated "victim witness or informant before and after the fact," and engaged in "willful blindness." He also claimed that I had committed ineffective assistance of counsel, purposeful avoidance of truth, failure to perform administrative duty, adverse interest of agency, spoliation of evidence, as well as threatening or intimidating victim, witness or informant, and committing deprivation of rights under color of law, conspiracy to interfere with civil rights, depriving persons of rights or privileges, engaged in aggravated perjury and trial misconduct, obstructing justice, purposefully avoiding the truth, and more. ECF 106 at 3-4. Mr. Souter also charged defendant Andrew McCauley with "habitat[ing] an 'evil eye' that 'intimidated and disabled'" him while testifying and in the parking garage. ECF 106 at 4-5.

8. Mr. Souter's wild accusations compelled my associate and myself immediately to move to withdraw from his representation, which we did the next working day. ECF 107. The

Court granted the motion three days later, ECF 112, and shortly thereafter denied the motion for new trial, characterizing Mr. Souter's accusations as "absurd." ECF 117.

Review of *Johnson* factors

9. In the paragraphs that follow I review the factors relevant to assessment of an application for a court awarded fee under *Johnson v. Ga. Hwy. Exp.*, 488 F.2d 714 (5th Cir 1974), adopted by the Fourth Circuit in *Barber v. Kimbral, Inc.,* 577 F.2d 216 (4th Cir. 1978) and more recently endorsed by the Fourth Circuit in *Robinson v. Equifax Info. Servs*., LLC*,* 560 F.3d 235, 243 (4th Cir. 2009).

The Results Obtained

10. Mr. Souter's success was in part legal and in part financial. The legal success took the form of the entry of summary judgment on liability against three law enforcement officers on Fourth Amendment claims for wrongful arrest and excessive force. The Court can take judicial notice that such success by a plaintiff in such a lawsuit is extraordinarily rare. Having litigated law enforcement misconduct cases for over four decades, I have on several prior occasions sought, but never obtained, summary judgment on liability. I have received numerous communications from other counsel doing this work regarding how unusual and professionally significant the Court's summary judgment decision is.

11. The complaint sought an award of damages and punitive damages "appropriate to the proof at trial." ECF 1 at 8. Mr. Souter's recovery of $50,000 in damages (all or almost all net to him, as his reasonable fees and costs will be paid by defendants as this Court will determine) is properly measured against the fact that he did not introduce a single bill, medical or otherwise,

into evidence, and relied, for his damages, on the jury's assessment of how fairly to compensate a man who was unconstitutionally arrested and injured as he was. Indeed, given Mr. Souter's not having submitted documentation demonstrating financial loss, defense counsel argued – in vain – that the court should give a nominal damages instruction, as "there has been no financial damages that have even been offered in this case." Exhibit 3 at 20:9-10. In sum, the result obtained was decidedly favorable both legally and financially.

Time and Labor Required.

12. The work done on this case by my firm for which I seek compensation is set forth in the itemization of hours attached hereto as Exhibit 4. I have excluded fees for redundant work, hours I deem excessive, many hours spent gathering information on physical and emotional damages which we determined not to present as evidence, and all time expended by student law interns and externs who worked on aspects of the case. *See* Exhibit 5. The total time expended for which compensation is not sought amounts to 398.1 hours. Exhibit 4 at 16, Exhibit 5 at 1. The total costs of $5,699.29, including $1,901 for a transcript of the trial that Mr. Souter ordered, speaks for itself in terms of the economy of work on a case that went through trial.

13. In this small (two-lawyer) firm, the research and initial drafting of legal arguments and pleadings is typically done by Charles Tierney, a non-practicing law graduate who has been my senior research assistant since 2011, and my associate, since August 2020 Nickera Rodriguez. They are far more adept than I with on-line legal research, and their court-approved rates ($250/hour) are significantly less than my own (most recently $600/hour). Typically, my colleagues do the requisite research and initial drafting of legal arguments, which I then revise, put into final form, and incorporate with the factual portions I typically prepare myself. That is

how we addressed this case.

14. Ms. Rodriguez was an able researcher but an inexperienced federal litigator when she came to my firm. Of necessity, apart from legal research and initial drafting, I did most of the work advancing the lawsuit. The depositions were few and short, and it would have consumed more time for me to prepare Ms. Rodriguez to take them than for me to get them done. Mr. Souter felt the injustice done him keenly and had an expansive, emotive, approach to his injuries and damages. In keeping with the theory of the case I had established at the outset, I communicated with him extensively via email and phone, and spent significant time over numerous Zoom sessions, to prepare him for his deposition and his trial testimony. I sought to have him avoid florid overstatement, inviting impeachment and thus risking the jury's discounting of his testimony.[2]

15. For ease of analysis, I have divided the hours worked on this case by members of my firm for which I seek compensation into discrete categories. Itemized time entries in each category, and the totals for each timekeeper, appear in Exhibit 4. As a matter of billing discretion. In light of Mr. Souter's new trial motion, I have not included time logged following the conclusion of trial, with the exception of time spent on the instant application, which comes to 16.7 hours. The time for which I seek compensation for my firm is for the following work:

Initial work up (*see* Exhibit 4 at 1-2)

16. This involved receiving and reviewing the case referral from Tate Bywater;

[2]Mr. Souter's new trial motion provides insight into the kind of histrionics I sought to avoid at trial, and thus into the preparation required to have him present his evidence in court to best effect. The preparation was vindicated by Mr. Souter's direct examination, although some of defense counsel's cross-examination at trial elicited more florid responses than were desired.

interviewing Mr. Souter and possible witnesses; initially categorizing a box-full of documents and videos from Mr. Souter relative to his claims; clarifying and finalizing a proposed representation agreement with Mr. Souter; and drafting and finalizing the complaint. The total hours spent on this work for which compensation is sought come to 37.5.

Disclosures and Paper Discovery (*see* Exhibit 4 at 3-4)

17. This involved review and appropriate processing of the substantial amount of documentation provided by Mr. Souter and Tate Bywater so as to identify documents potentially disclosable and disoverable; drafting disclosures; drafting interrogatories and requested admissions to all defendants; subpoenaing documents from third parties; reviewing and processing of all responses to incoming discovery; and drafting proposed responses to three sets of interrogatories and requests for documents and finalizing the responses with Mr. Souter. The total time for which compensation is sought comes to 64.6 hours.

Testimony Preparation, Depositions & Follow-up (*see* Exhibit 4 at 5)

18. This work took three principal forms: (1) intensive, ongoing work with Mr. Souter on how to present his evidence in testimony in deposition and at trial, (2) preparation for and taking the depositions of the three defendants and one witness, and (3) reading, annotationg and outlining the depositions transcripts once received. Included here are also communications with Mr. Souter and opposing counsel bearing on discovery and deposition issues. The total time for which compensation is sought comes to 34.9 hours.

Motions and Hearings (*see* Exhibit 4 at 6-7)

19. There were no discovery motions in the case. The principal motions were the parties' cross motions for summary judgment, each of which was very fully briefed, with supplements to

the record being filed, with leave of Court, following reply briefs. *See*, ECF 21-37. We also filed a motion *in limine* on behalf of Mr. Souter, which was largely, although not entirely, successful. The short pretrial conference is posted to this category as well. The total time for which compensation is sought for this work comes to 49.2 hours.

Trial Preparation (*see* Exhibit 4 at 8-11)

20. The details of this work, comprising the largest category of hours presented here (193.3 hours), are set forth in Exhibit 4 at 8-11; the entries are self-explanatory.

Defendant's Notice of Appeal (*see* Exhibit 4 at 12)

21. Following entry of summary judgment on liability against them, defendants filed a premature notice of appeal to the Fourth Circuit. After I brought this to the attention of defense counsel, we agreed to a consent order of dismissal of the appeal. ECF 47. The time expended on securing agreement to this procedure was 0.8 hours.

Preparation of Application for Award of Fees and Costs (*see* Exhibit 4 at 13)

22. Defendants having declined to settle Mr. Souter's fees and costs for less than what is requested here, I have drafted and finalized this declaration and accompanying application. The time taken to do so is 16.7 hours.

23. The itemization of work by time-keeper – both billed and not billed – for each category appears at Exhibit 5.

Skill Required

24. The skill required to perform the legal services at issue is best assessed by the Court, which witnessed the results of our work and is in the best position to assess the skill with which it was performed. A significant exception to what was visible to the Court are the hours of work

that went into making Mr. Souter a viable witness rather than one in the mode of his new trial motion, ECF 106. I believe that Mr. Souter's favorable verdict reflected the strategy I required as a condition of taking the case: putting almost all our eggs into the basket of the unconstitutionally procured warrant, and letting Mr. Souter's injuries speak for themselves on his excessive force claim, rather than independently elaborating that claim, to say nothing of securing an expert witness to address it. I also can and do attest to the excellence of the work of Ms. Rodriguez and Mr. Tierney in supplying me with the research and drafts I needed to advance the case.

25. I only recently imposed on professional colleagues to attest to the reasonableness and appropriateness of my firm's time spent on another case successfully concluded here without trial (*Wingate v. Fulford,* No. 1:18-cv-937), in which a fee decision was handed down by Judge Trenga last month. *Id.,* ECF 141. Given the modesty of the hours and costs expended on the instant case, which, unlike *Wingate*, went through trial, rather than imposing on colleagues again so soon, or retaining an expert to support my application, I respectfully offer my firm's hours to the court and opposing counsel for such assessment as they may make of their reasonableness. I will respond, as needed, on rebuttal to any questions defendants have about my firm's work.

Hourly rates

26. My billing rate was $600/hour from 2017 through 2021. I was awarded fees in civil rights cases at this rate by Judge Alston in 2020 for work done in 2019 (*Rogers v. Va. State Registrar*, 2020 WL 3246327 (E.D. Va. Jan. 23, 2020), and by Judge Trenga last month for work done in 2018-2021 (*Wingate v. Fulford*, No. 1:18-cv-937 (ECF 141). Both Judge Alston and Judge Trenga deemed the so-called *Vienna Metro* matrix applicable to these cases. *See Rogers*

fee opinion (ECF 72) at 9 ("[T]he Court finds that *Vienna Metro Matrix* is applicable to this case"), and *Wingate* fee opinion (ECF 141) at 141 ("These rates fall well within, or in several cases well below, the ranges specified by *Vienna Metro* . . . .") [3]

27. My associate Nickera Rodriguez has been with my firm since August 2020 and joined the Virginia bar in October of that year. She worked extensively and ably on this case, as set forth in the accompanying time sheets. My senior research assistant Charles Tierney has been with my firm since 2011. A gifted non-practicing lawyer who spent 17 years litigating with the District of Columbia Public Defender Service, he has been the firm's principal researcher since coming on board. His billing rate, reflecting his non-lawyer status rather than the actual value of his work, is $250/hour, which is also the rate at which I bill Ms. Rodriguez. As noted, Judges Alston and Trenga have approved these rates.[4]

<u>Novelty and Difficulty of the Issues</u>

28. I did not deem this case novel, nor difficult from the legal standpoint given the Fourth Amendment violations that led to Mr. Souter's arrest. The difficulties with the case were

[3]Given judicial approval two times over in the recent past, by two judges of this Court, of my firm's rates requested here, and having only recently imposed on colleagues to provide sworn declarations supporting my firm's fees in *Wingate,* I have not provided a new set of declarations attesting to the reasonableness of my firm's rates. I respectfully refer the Court in this regard to the declarations filed in *Wingate* as ECF 133-1 through 133-6, attesting to the reasonableness of the firm's rates here at issue. They are attached as Exhibit 7.

[4] Judge Trenga expressly rejected defense objections in *Wingate* (made by the same counsel who represents defendants in the instant case) that Mr. Tierney's licensing history should preclude this firm's receipt of a fee for his work. *Wingate,* ECF 141 at 6 n.6. Similarly, in awarding a fee six years ago in *Salim v. Dahlberg*, No 1:15-cv-468 (ECF 223), while faulting this firm's fee application on grounds never again presented, Judge Brinkema did not even deign to address defendant's caustic objection to compensation for Mr. Tierney's work (ECF 204 at 15-16). The hourly rate sought by and previously awarded Mr. Tierney does not begin to reflect the value of his contribution to the firm's work for eleven years, and to the litigation at bar.

in preparing Mr. Souter to testify. His understandable, but from a litigation standpoint counterproductive, expansive, not to say histrionic, recitations of what had occurred threatened to turn a strong legal claim into a problematical presentation to a jury. *(See,* in this connection, the allegations in his *pro se* new trial motion, ECF 106 at 3-5, characterized by this Court as "absurd." ECF 117 at 2.) I worked with Mr. Souter at length both before his deposition and, more so, before trial in an effort to ensure a helpful presentation. Opposing counsel remarked to me that he anticipated Mr. Souter would self-destruct on the witness stand. I understood what he meant and told Mr. Souter what he had said. To Mr. Souter's credit, as a result of our extensive preparation this did not happen – at all on direct examination, and less on cross-examination than I had feared.

Preclusion of Other Work.

29. One hundred percent of the work my firm did on this case was preclusive of work we would otherwise have done for other clients. This small firm has an active litigation docket almost entirely in the Rocket Docket.

Customary Fee for Like Work.

30. From my work of several decades addressing law enforcement misconduct, I am aware that few local lawyers bring such cases. To my knowledge, none who does charges an hourly fee, as the clients in such cases are typically unable to bear such expenses.[5] The cases are thus typically taken with a view to payment pursuant to 42 U.S.C. §1988 following an

[5]Mr. Souter was a modest exception to this rule: he covered costs, and paid a total of $2,000 in fees when my firm began its work on his case.

application such as this one.[6] For several years, my hourly rate for the few clients I have had who pay it has been $600. I am requesting that amount here although my billing rate is increasing to $650, belatedly consistent with the *Vienna Metro* matrix and a reflection of Judge Trenga's recent observation that my firm's rates "fall well within, or in several cases well below, the ranges specified by *Vienna Metro*. . . ." *Wingate,* ECF 141 at 5. I do not seek greater hourly fees than were awarded my firm in past years.

<u>The Nature of the Fee</u>

31. My agreement with Mr. Souter provided that he would cover costs up to $8,000 and pay the firm $2,000 as a flat fee to take his case on an otherwise contingent fee basis. If we prevailed, my firm was to be paid the greater of one-third the proceeds of suit or settlement, or a fee calculated at our firm's regular rates, as negotiated with the defense or awarded by the court.

<u>Time Limitations</u>.

32. There were no significant time limitations imposed by the client or the circumstances.

<u>The Experience, Reputation and Ability of Counsel</u>

33. I respectfully leave this criterion to be assessed by the Court, before whom I have appeared on numerous occasions. *See also* the observations of Judge Alston quoted at 2, ¶2 *supra* and the declarations supporting my fee application in *Wingate.* The work done by Ms. Rodriguez and Mr. Tierney was excellent; I relied on it throughout, to our ultimate success.

---

[6]Percentage contingent-fee arrangements make no economic sense in most §1983 lawsuits against law enforcement officers unless the victim died, was permanently or otherwise seriously injured, or otherwise suffered a large loss. In most law enforcement (and jail and prison) misconduct cases, an award under 42 U.S.C. §1988 will typically significantly exceed one third of the plaintiff's recovery. Litigators who do this work know this, and count on court-awarded fees for their livelihood.

The Undesirability of the Case

34. From a conceptual standpoint, I did not deem this case to be any more undesirable than any other law enforcement misconduct case I have litigated over the years. They are all undesirable from two standpoints: First, among many persons and communities, bias persists in favor of law enforcement officers. While the police killings of George Floyd and Breonna Taylor in 2020 sensitized many persons to police misconduct, the response is polarized and includes equally vigorous support of the police ("Blue Lives Matter"). Since a jury must be unanimous, police misconduct cases, like cases for prison and jail inmates, are always at risk until the verdict is in (and the appeals are done). Ideological overtones of this sort, absent from virtually all other civil litigation, are a troublesome staple of all police misconduct work. Apart from these generic issues posed by law enforcement misconduct cases, the other less desirable element was having to prepare a impassioned client requiring an unusual amount of coaching to present testimony a jury could be expected to look on with favor. *See* discussions at 7, 7 n.2, and 4 *supra.*

Relationship With Clients.

35. I was unacquainted with Mr. Souter until I was introduced to him by his former counsel at Tate Bywater.

Awards in Similar Cases

36. I have settled my claim for attorneys fees and costs in the case majority of my fee-shifting cases. In 2020, Judge Alston awarded my firm fees in accordance with the rates requested here, *Rogers, supra*, ECF 72, and last month, Judge Trenga did the same, awarding a total of $177,332.50 in fees on a case arising out of an unconstitutional stop and arrest. *Wingate,*

*supra,* ECF 141. The *Wingate* fee followed settlement after appeal, with no trial having taken place. Less that that ($168,710) is sought here, for a case that was tried to verdict for three days. As for the fees and costs requested in connection with the instant application, in *Wingate,* Judge Trenga awarded me $10,000 for the work done in connection with applying for fees and costs in that case. Counsel for the defendant in *Wingate,* who represents defendants in the instant case, did not take issue with that requested fee, and the fee for the instant application amounts to $20 more.

Costs

37. The costs incurred in this case amount to $5,699.29, including $1901.65 for a transcript of the trial ordered by Mr. Souter. See Exhibit 6. These are the lowest costs I can recall ever having incurred in a case that went through trial. I believe that these modest costs, as well as the lack of motions practice during the course of the litigation, bespeak the efficiency with which the case was litigated, and support an award of the fees and costs requested here.

Requested Award

38. Based on the above, I respectfully request a fee award for my firm's work in the amount of $168,710 and costs in the amount of $5,699.29.

Dated: November 11, 2022

//s// Victor M. Glasberg
Victor M. Glasberg